(82 South. 745)

Nos. 22108 (and 21527).

NEELY v. TEXAS & P. RY. CO.

(Dec. 11, 1916. On the Merits, June 30, 1919.)

*(Syllabus by the Court.)*

1. APPEAL AND ERROR ⬥⟼14(1) — APPEAL BOND—DEVOLUTIVE APPEAL—VALIDITY.

Where an order for a devolutive and suspensive appeal was granted conditioned upon the appellant furnishing a bond with good and solvent security in the sum of $250, and an appeal bond in said amount was furnished by the appellant, and thereafter the appellee moved the court below to set aside said bond on the ground of the insolvency and insufficiency of the surety, which motion was overruled by the trial judge, but on appeal was sustained by the Supreme Court; and where, pending such litigation, the appellant obtained another order for a devolutive appeal, which he perfected by giving bond and filing the transcript in the Supreme Court, *held*, that the first appeal never became operative, and the appellant had the right under the new order to prosecute his devolutive appeal.

On the Merits.

2. CARRIERS ⬥⟼213 — SHIPPER'S CHANGE OF ROUTE—DAMAGES—LIABILITY.

Where traffic over the direct line of a railroad is rendered impossible by the submergence of part of the road, as the result of a crevasse, and a shipper of cattle directs that they be sent by a circuitous and longer route, he has no just cause of complaint that their transportation requires more time, and that they are more "drawn" upon their delivery than they would have been if carried by the shorter route.

3. EVIDENCE ⬥⟼477(5), 568(1) — OPINION — LIVE STOCK—DAMAGES.

Where cattle have not been weighed either when shipped or when delivered, a witness who sees them only when delivered is in no position to testify that they have lost any specific weight in their transit, and his opinion that they look more drawn than they should is not sufficiently definite, either as to the cause or the extent of the loss of weight, to authorize a judgment for damages to be computed on that basis.

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by Jeff D. Neely against the Texas & Pacific Railway Company. Judgment for defendant, and plaintiff obtained an order for devolutive appeal. Motion to dismiss appeal overruled, and judgment affirmed.

Prowell & Prowell and Callan, Blanchard & Viosca, all of New Orleans, for appellant.

Howe, Fenner, Spencer & Cocke, of New Orleans, for appellee.

LAND, J. [1] This is the second appeal by the plaintiff from the judgment in favor of the defendant.

The motion to dismiss was on the ground that the first appeal, pending in this court, divested the court below of jurisdiction to grant another appeal.

It appears from the record of case No. 21527 of the docket of this court (140 La. 445, 73 South. 262), that a recent decree has been rendered, dismissing the first appeal on the ground of the insufficiency of the surety on the appeal bond.

The first order of appeal was for a devolu-

tive and suspensive appeal, conditioned upon plaintiff furnishing bond with good and solvent security in the sum of $250.

As the bond was furnished within ten days after the judgment was signed, it was suspensive in its character.

Defendant moved the trial court to set aside this bond on the ground that the surety was insolvent and insufficient.

This motion was overruled, whereupon the defendant appealed to the Supreme Court (140 La. 445, 73 South. 262), which reversed the ruling and sustained the motion.

In the meantime the plaintiff within the year had obtained another order for a devolutive appeal, and furnished bond in the sum fixed by the court.

The first order of appeal became inoperative from the mere failure of the plaintiff to furnish a bond with good and solvent security, and the plaintiff had the legal right to obtain the order for a devolutive appeal. See Meeker v. Galpin, 4 Rob. 259, cited in Barrow v. Clack, 45 La. Ann. 482, 12 South. 631. See, also, Durel v. Murphy, 124 La. 157, 49 South. 1013.

In the instant case a new order of appeal was taken as suggested in Durel v. Murphy, supra.

The new order of appeal may have waived the first order of appeal, but the latter, never operative in law, did not prevent the plaintiff from taking an appeal according to law.

The cases cited by counsel for the defendant have been considered, but we do not think that they are applicable to the case before the court.

Motion to dismiss overruled.

### On the Merits.

MONROE, C. J. Plaintiff has appealed from a judgment rejecting his demand for damages, attributed by him to defendant's delay in the transportation and neglect in the handling, en route, of certain carloads of cattle, shipped for his account at Ft. Worth, Tex., in June, 1912, and consigned to New Orleans, of which defendant was the initial carrier; as also his demand for certain penalties alleged to have been incurred by defendant for failure to pay the claims within the delay prescribed by Act 29 of 1908.

The facts developed by the evidence adduced on the trial are substantially as follows:

Prior to June 1, 1912, a crevasse had opened in the levee constituting the west bank of the Mississippi river, within the limits of this state, through which the waters of that stream had inundated a wide territory and submerged large sections of the different railroads included therein, thereby cutting off the city of New Orleans from the sources usually relied on for its supply of beef cattle, with a resulting scarcity of that essential food product and high prices therefor. In that situation it occurred to plaintiff that, though the more direct route from Ft. Worth, Tex., which was one of those sources, over defendant's road, was closed by reason of the fact that part of the road, within this state, was under water, money might be made by shipping cattle at Ft. Worth, where the road was dry, and routing them over other roads which were not submerged, the following admissions having been made by him on his cross-examination, to wit:

"Q. On the 1st day of June, 1912, you didn't know that the Texas & Pacific line—the main line itself—was out of commission between Ft. Worth and New Orleans? A. That was what brought me to Ft. Worth to buy cattle. Q. That is what I want to get at; you went to Ft. Worth to buy cattle because you could not get them from Ft. Worth to New Orleans as you ordinarily did, didn't you? A. Yes, sir. Q. And when you got to Ft. Worth, you there found some other route by which you got cattle into New Orleans? A. I didn't have to find, because I knew I could send them by Memphis. * * * Q. Now what other way

could you send them except (by) Memphis? A. I didn't know no other way, except from the statement that you sent them via Shreveport. * * * Q. Mr. Nealy, you knew at this time, June, 1912, cattle prices in New Orleans were very high, didn't you? A. Yes, sir. Q. Now what was the high price due to? A. On account of the high water. Q. Which prevented people from getting cattle into New Orleans? A. Yes, sir; I knew I could get them here via Memphis."

[2] The significance of those admissions will appear when it is understood that plaintiff bases his suit upon the complaint that his cattle, shipped according to his instructions, by a route other than the direct route over defendant's road, were not delivered in New Orleans within 72 hours, the usual time consumed in transportation by that route. Thus article 3 of his petition reads:

"Petitioner alleges that the customary time for the transportation of cattle from Ft. Worth, Tex., to New Orleans, La., is approximately 72 hours, and that it is customary for said petitioner to ship his cattle from Ft. Worth, Tex., to New Orleans, La., in time for said cattle to arrive at New Orleans in close proximity to 72 hours after leaving Ft. Worth, Tex., or in time to be disposed of to advantage on Mondays and Fridays, which are the best market days for cattle in New Orleans," etc.

As he states in his testimony, plaintiff went to Ft. Worth to develop his idea, and remained there for some time, discussing the question of its feasibility with G. C. Schmidt, the representative of the Cassidy Southwestern Commission Company, his agent for the shipment and routing of the cattle purchased by him, and, together with Mr. Schmidt, discussing it with defendant's agent; and, according to Mr. Schmidt's testimony, he instructed Schmidt to ship the cattle by the routes over which, in accordance with that gentleman's written instructions to defendant, they were, in fact, transported. In other words, Mr. Schmidt shipped the cattle, and, for each shipment prepared a "shipping ticket," bearing upon its face the instruction as to the route by which it was to be carried, and those instructions were obeyed by defendant; some of the shipments going, via Texarkana, to Memphis, and thence to New Orleans, and others, via Shreveport and Vicksburg, to Meridian and thence to New Orleans. As the latter route is the shorter of the two, it is probable that Mr. Schmidt, would have sent all the shipments in that way but for the following circumstances: On June 7th, when the first shipment was made, the V. S. & P. road from Shreveport to Vicksburg, which had been partly submerged, had not been reopened to traffic. Notice was given, however, that the company would receive freight on June 10th, and on that day three cars of plaintiff's cattle were forwarded by defendant to Shreveport, and, arriving on the morning of the 11th, were accepted; but on the night of June 10th the "incline" at the point on the Mississippi river at which the cars of the V. S. & P. Co. were ferried over to Vicksburg, caved in, and two other cars, forwarded by defendant on June 11th and arriving at Shreveport on the 12th, were rejected for that reason. The three cars that were accepted were sent to the stockyards of the Vicksburg, Shreveport & Pacific Company, at Monroe, and the cattle were there cared for. The two cars that were rejected were sent to defendant's stockyards, or pens, at Shreveport, and the cattle received such attention that one carload gained 1,100, and the other 800 pounds in weight during the few days that they remained there, to wit, until June 16th, by which time, the "incline" having been repaired, they were again started on their journey, and arrived in New Orleans on June 18th. The cars routed via Texarkana and Memphis appear to have gone through on schedule time, though there was but little difference between that time and the time consumed in the transportation of the cars that were forwarded by the other route, the

delay on the one route, resulting from the caving of the "incline," having, apparently, been compensated, or partly compensated, by the difference in the length of the haul as compared to the other route. The shipments in both instances having been routed in accordance with plaintiff's instructions, and the delay having been caused by the action of the Mississippi river, over which defendant had no control, it cannot be held liable for the consequences.

[3] Plaintiff's claim, in so far as it is predicated upon the allegation that his cattle were not properly cared for while en route, is supported by no other testimony than that of his partner, Mr. Joachim, who received the cattle in New Orleans, having never seen them before, and who testifies that they exhibited an unusual amount of "shrinkage." According to the consensus of the testimony, however, cattle will inevitably lose from 5 per cent. to 6 per cent. of their weight during the first 36 hours that they are being transported by rail; 3 per cent. during the next 36 hours, and. say, 1 per cent. for each 24 hours thereafter, so that a steer weighing 1,000 pounds is likely to lose about 90 pounds in 72 hours, and one weighing 750 pounds less in proportion. Several of the witnesses, familiar with the cattle business, as conducted at Ft. Worth, testify that the best cattle are shipped thence to Kansas City and St. Louis, and that only the "tailings" are shipped to New Orleans. And several of them say that no human being who has not seen cattle at the point of shipment can determine, merely by inspecting them at the point of delivery, how much they have lost by reason of that particular trip. The record does not inform us how the cattle here in question reached Ft. Worth, but suggests the inference that they came from ranches, and that they must have been either driven there, or brought by rail, and that in either case there must have been shrinkage from their original condition, which, being considered inevitable, would not militate against their being received as in good order. That there should have been further shrinkage by reason of their trip from Ft. Worth to New Orleans is not only probable, but certain, but we fail to find anything in the record which would enable us to determine the extent, or to hold that it should be attributed to any negligence on the part of the carriers. A question was raised as to the admissibility of the testimony of H. C. Newberry, taken outside of the state, under Act 176 of 1910, but we consider it unnecessary to pass upon it, as our conclusion would be the same without that testimony. That conclusion is that there is no error in the judgment appealed from, which is therefore

Affirmed.